ST. GEORGE R. FITZHUGH and Others v. LUCY GRAY HARRISON.

February 2, 1899.

Nos. 11,392—(239).

| 75 | 481 |
| 84 | 383 |
| 75 | 481 |
| 85 | 137 |

Construction of Contract—Liability of Estate of Decedent.

A certain contract construed, and *held*, that it imposed a contingent liability upon appellant's testator, which became absolute at or before his death, and was provable against his estate.

Appeal by defendant, as executrix of the last will of Matthew B. Harrison, from an order of the district court for St. Louis county, Ensign, J., denying a motion for a new trial. Affirmed.

*Walter Ayers* and *W. W. Henry,* for appellant.

*Billson, Congdon & Dickinson,* for respondents.

START, C. J.

The respondents presented a claim in the probate court of the county of St. Louis against the estate of M. B. Harrison, deceased. The claim was allowed in part, and the executrix appealed from the order allowing the claim to the district court, where, upon pleadings framed, the cause was tried by the court without a jury. The trial court made findings of fact, and as a conclusion of law directed judgment in favor of the respondents against the estate of Harrison for the sum of $27,629.88. The executrix appealed from an order denying her motion for a new trial.

The important and controlling question presented by the record for our decision is whether the trial court's conclusion of law was warranted by its findings of fact. The answer to be given to this question depends on the construction to be given to two contracts which are designated in the findings and record as Exhibits A and B, respectively.

There is little or no controversy as to the meaning and legal effect of Exhibit A. M. B. Harrison and his then partner, E. G. Handy, secured an option for the purchase of 160 acres of land in or near the city of Duluth for the sum of $75,000, and for the purpose of obtaining the money to pay for the land they enlisted a syndicate of gentlemen, of which the respondents were members.

75 M.—31

Thereupon, and on February 14, 1887, they executed a separate contract with each member of the syndicate, but all of the contracts were identical in their terms and conditions. Exhibit A is the contract entered into with the respondent Fitzhugh, and for convenience it is referred to as the contract with the syndicate as to the entire interest in the land.

The firm of Harrison & Handy, by the terms of the contract, agreed to resell and convey the entire land at cost price, in undivided shares, to the parties contracted with. In consideration of the benefits to accrue to the parties so purchasing and the agreement of the firm to take charge of the platting, improvement, care and resale of the land without charge to the purchasers, it was agreed that the net profits to be realized from a resale of the land, or any part thereof, should be equally divided between the firm and the syndicate. Such net profits were to be estimated on the basis of first returning to the syndicate the money invested in the purchase of the land and the interest paid by it on the deferred payments; also the principal of the deferred payments, if paid, together with all taxes, assessments, public charges, cost of deeds and recording the same, of surveys at any time made, of opening and grading streets on the land, and of other improvements of the same, and of attorneys' fees paid; treating as net profits only the excess over such outlays, actually realized from the resale of the land, whether in whole or in parts or parcels thereof. This contract also provided that whenever so much of the land had been sold that the remainder was profit, such remainder should, at the election of any of the parties in interest, be apportioned among those entitled thereto, and proper deeds of partition therefor should be made. It also provided that the firm should have the exclusive care and management of the land, and the exclusive right to sell the same, until partition thereof; that they should attend to the payment of all taxes and charges thereon, and to all work done in improving it.

It is clear from the terms of this contract that the firm were to have nothing for their services unless there was a profit as defined therein, and that they were not to bear or be charged personally with any part of the losses, if any there were; and, further, that all

payments and advances made by the syndicate for the purposes enumerated in the contract, including improvements, were made a charge on the land, as between the parties, which were to be repaid before there could be any division of profits, or partition of the land among those interested therein.

In accordance with the terms of this contract, the firm duly caused to be conveyed to each member of the syndicate his individual interest in the land, and afterwards, and before the execution of Exhibit B, the entire title thereto was vested in the respondents, in trust for all parties interested therein, one of whom was Harrison, who then owned an undivided three-twentieths of the land. Harrison succeeded to the interest of Handy in the contract, and platted the land into lots under the name of "Brookdale Division of Duluth." He sold the north half thereof, early in the year 1889, for the sum of $86,000, subject, however, to the condition that $46,000 of the purchase price should be immediately expended by the trustees in the erection of dwelling houses and improvements incident thereto on the south half retained by them. At the time of this sale there had been paid and expended, pursuant to the provisions of Exhibit A, for the purchase price of the land, and for taxes, assessments, surveys and other expenses, the sum of $93,875, no part of which had been paid. Upon the completion of the sale a partition of the south half of the land was had between the owners thereof and Harrison, except the 48 lots mentioned in the contract Exhibit B, whereby 300 lots were conveyed to Harrison as his half of the assumed profits for services under the terms of the contract Exhibit A.

At or about the time of the delivery of the deeds of partition, and as a part of the same transaction, the contract Exhibit B was executed, and the sum of $40,000 was distributed among the members of the syndicate in proportion to their respective interests. The contract Exhibit B is in these words:

"Whereas, M. B. Harrison, agent, has sold eighteen lots in the south half of Harrison's Brookdale Division of Duluth, it is agreed that, as soon as the plat of said division is duly recorded, he is to receive from the purchasers of said lots the cash payments therefor, and the notes for the deferred payments, the said cash payments

to be turned over to St. Geo. R. Fitzhugh, Tazwell Ellett, and John Hunter, Jr., trustees, to be disbursed by them to the parties entitled thereto; and the said M. B. Harrison is to have the notes for the credit payments discounted, if practicable, and turn the money over to the said trustees to be similarly disposed of. And whereas, the said trustees and M. B. Harrison have selected and set apart thirty lots upon which is to be expended the sum of $46,000 in buildings, and said Harrison is to sell said lots and buildings for a sum sufficient to pay not less than $600 per lot and the $46,000 put thereon in buildings, with interest on the said $46,000, sufficient cash payment or payments to be required to make the lots perfectly good security for the balance of the purchase money therefor; the notes for the deferred payments to be discounted, if practicable, and the money received for said lots and buildings to be paid over to the said trustees, and to be applied to pay to Gen. Jos. R. Anderson $300, and to M. B. Harrison $2,000, with 6 per cent. interest on said sums, respectively, from the date of the deeds of partition to so much of the south half of Brookdale Division as has been divided, said sums being due the said Anderson and the said Harrison on account of owelty of partition; and the balance of the said purchase money for said lots and buildings is (1) to be applied to pay to the owners of the south half of Brookdale Division whatever may be due them on account of the purchase price, taxes, assessments and expenditures thereon, and (2) to pay back to said owners the sum of $46,000, expended in buildings, with 8 per cent. on $23,000, a part thereof, from the 18th of February, 1889, till paid; and any surplus of money derived from said lots and buildings then left is to be divided equally between M. B. Harrison, agent, and the owners of said property, according to their respective shares and interests therein in accordance with the original contract between said Harrison and the owners of said tract. The said M. B. Harrison is to superintend the erection of the buildings on said lots, and as far as practicable to see that the contracts between us and Hodgson & Co. and the building contractors are faithfully performed and completed by the 15th day of September, 1889.

"And whereas, the said trustees and the said M. B. Harrison, considering the 18 lots recently sold by him and the thirty lots set apart for building purposes, and the forty-six thousand dollars to be applied to the erection of said buildings, as ample to constitute a fund sufficient to reimburse the owners of said tract for the purchase money and other funds disbursed by them, have prepared deeds for the partition and division of the remainder of said tract between said owners and said Harrison, treating the said land as representing profits, but it is understood and agreed that if, for any reason, the provision above referred to as made for the reimbursement of the owners should prove inadequate, then, and in that event, the said trustees are not to be precluded or estopped from

demanding and recovering from said Harrison in land or money an amount necessary to fully reimburse said owners.

"It is further agreed that said Harrison shall have the buildings erected on the said thirty lots insured so soon as they are turned over to him by the contractors, and as fast as the same shall be completed and accepted by him; said insurance to be taken in the name of said trustees."

Counsel for the respective parties differ radically as to the correct construction of this contract, and each has submitted an exhaustive argument in support of his contention.

It is substantially urged on behalf of the appellant that this last contract treats the first one as so far performed as to make a division advisable, and it is made; hence the second contract must be considered by itself as a mere contract of agency in a new venture, as to which Harrison is not to bear any losses or incur any liabilities, but is to receive one-half of the profits of the venture for his services. This conclusion can only be reached by assuming that the syndicate unconditionally credited the whole $86,000 received for the north half of the land upon the $93,875, which they had paid and advanced as provided in the first contract, leaving only $7,875 as a charge against the residue of the land; and that this deficit, and the repayment of $46,000 which was to be expended in buildings, and the other charges mentioned in the contract, were absolutely provided for by setting apart 48 lots, upon 30 of which houses were to be built, and that thereupon the remaining lots were divided as profits, and the first contract thereby unconditionally executed.

This assumption is not justified by the language of the contract. But, further, it entirely ignores so much of the contract as declares that the trustees and Harrison have considered the 48 lots so set apart and the buildings to be erected thereon as ample to constitute a fund to reimburse the syndicate, but if this proves, for any reason, inadequate, the trustees are not to be precluded from recovering from Harrison in land or money an amount necessary fully to reimburse the syndicate. This reservation or proviso is an essential part of the contract.

When this contract is read in the light of all that preceded and

led up to its execution, its meaning is reasonably clear. It is not an independent contract, but it is supplemental to the original contract, and conditionally modifies the latter as to the provision that no division of profits or partition of the land as profits should be made until all of the advances of the syndicate are paid. It assumes tentatively that the 48 lots, with the proposed improvements, will be sold for an amount sufficient to pay all of the charges of the syndicate for advances, including the improvements, and leave a profit to be divided between the syndicate and Harrison, who agrees so to sell the 48 lots. Upon this assumption and agreement the original contract is so far modified or departed from that the parties conditionally treat all of their land, exclusive of the 48 lots, as profits actually realized, and agree to, and do, so partition it between the syndicate and Harrison, but with an express reservation and agreement that if Harrison fails within a reasonable time so to sell the 48 lots, whereby or for any other reason the provision for the reimbursement of the syndicate proves inadequate, the trustees shall not be precluded by the premature partition of the land as profits from recovering from Harrison in land or money an amount necessary fully to reimburse the owners.

In short, the contract provides that the distribution of the residue of the land as probable profits shall not, in case the scheme adopted for the reimbursement of the syndicate proves inadequate, preclude the trustees from recovering from Harrison in land or money the equitable pro rata share of the deficit which would have been chargeable under the terms of the original contract against the lots conveyed to him as anticipated profits pursuant to the supplemental contract. After the adoption of the reimbursement scheme, if the terms of the original contract had been adhered to, and no partition made, any deficit after exhausting the 48 lots would have been a charge against the residue of the land; that is, it could not be partitioned as profits until the deficit was paid. A sale by the syndicate of so much of the residue of the land as might be necessary to pay the deficit would be, in its last analysis, the enforcement of one-half of the deficit against the half interest of Harrison in the residue. But by the supplemental contract one-half of the residue (300 lots) was conveyed to him freed from the charge for

any part of the deficit, in consideration of his agreement that the transaction should not preclude the trustees from recovering from him in land or money an amount necessary to reimburse the syndicate in case the scheme adopted for the payment of the amount due for advances proved inadequate. The one-half of the land conveyed to the syndicate as profits was chargeable with one-half of the deficit, and it would require the payment by Harrison of only one-half of the deficit in order to reimburse the syndicate.

Therefore, when the scheme proved inadequate, the contingent liability of Harrison to reimburse the syndicate to the extent of one-half of the deficit (which would have been a charge on the lots conveyed to him, if the syndicate had retained them, as provided in the original contract) became absolute. This amount he had the option, under the contract, to discharge in land or money. He did not exercise his option to discharge the liability in land, hence it became a money demand. 2 Parsons, Cont. (8th Ed.) 651. The time within which Harrison was to sell the 48 lots was not fixed by the contract, but the law implies that he was to do so within a reasonable time. If he failed within such time to sell enough of the reserved lots to reimburse the syndicate, the scheme proved inadequate at and from the expiration of such time, and the deficit would be the difference between the total amount then due the syndicate and the then value of the 48 lots remaining unsold.

It follows from our construction of these contracts that the conclusion of law of the trial court is supported by its findings of fact.

The trial court found, with other facts, that the buildings were erected upon the 30 lots referred to in the contract Exhibit B in accordance with the condition imposed by the terms of sale of the north half of the original tract; that Harrison died, testate, February 29, 1892, and that at the date of his death the 30 lots with the buildings and improvements thereon, remained unsold, and are still held subject to the rights of the members of the syndicate, and that of the 18 lots mentioned in Exhibit B 15 were sold by Harrison, and the proceeds thereof, except $915.29, were expended by him in expenses connected with the property with the sanction of the trustees; and, further, that the value of the 30 lots, with the

improvements, at the time of Harrison's death, was $18,802, and that they have not been of any greater value since; that the time which elapsed between the making of the contract Exhibit B and his death was a reasonable time for making the sale by him of the reserved lots and houses as provided by the contract, and that the lots which were conveyed to him on account of his services were at that time reasonably worth more than the sum for which the court ordered judgment.

It is urged by the appellant that the trial court erred in its findings as to the value of the property remaining in the hands of the trustees, and as to the value of the lots conveyed to Harrison, and also in finding that a reasonable time had elapsed before Harrison's death in which to make sales, because they are not justified by the evidence. We have examined the record, and find that there was competent evidence introduced on the trial which is sufficient to support the findings.

The trial court, in ascertaining the amount necessary to reimburse the syndicate, struck a balance between the total amount due the syndicate for advances at the time of Harrison's death, which included interest on one-half of $46,000, and the then value of the property remaining in the hands of the trustees, and charged his estate with one-half thereof, to which interest was added from the day of his death. The appellant claims that it was error to include such interest. It was not, for by the terms of the contract interest on $23,000 was made a part of the sum for which the syndicate were to be reimbursed out of the reserved property, or, if that proved inadequate, by Harrison in land or money. The deficit was due, according to the finding of the court, at Harrison's death, a reasonable time in which to sell the reserved property having then elapsed; hence the right to interest from that date follows as a legal conclusion.

It is also insisted that the value of Harrison's three-twentieths interest in the unsold property of the syndicate should be set off against the claim of the trustees in this case. He was a member of the syndicate, and his interest in its property is a part of his estate, the value of which can only be determined by a final settlement of

the affairs of the syndicate. It is therefore not a proper subject for set-off or counterclaim in this action.

The remaining assignments of error have been considered, but only one of them merits special mention. The exception is the contention of appellant that the claim of the respondents was a contingent one, and was not provable in the probate court. A contingent claim is one where the liability depends upon some future event, which may or may not happen, and therefore makes it wholly uncertain whether there ever will be a liability. A contingent claim, if it becomes absolute, and capable of liquidation, before the expiration of the time limited for the presentation of claims to the probate court for allowance, must be presented, or it will be barred. G. S. 1894, § 4511; Hantzch v. Massolt, 61 Minn. 361, 63 N. W. 1069. Now, the liability of Harrison to reimburse the trustees in this case was contingent on his performance of his agreement to sell within a reasonable time the reserved property for an amount sufficient to reimburse them; for, if he failed to perform his agreement within the time limited, the provision for reimbursement proved inadequate. He did fail to perform his agreement, hence his liability to reimburse the trustees in some amount was absolute at the time of his death. The ascertainment of the amount thereof was a matter of detail, and the claim was provable in the probate court.

Order affirmed.